UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DONALD F. TUCK,
        Plaintiff,

vs.                                         CIVIL NO. 07-12853

MICHAEL J. ASTRUE,            DISTRICT JUDGE THOMAS L. LUDINGTON
        Defendant,             MAGISTRATE JUDGE STEVEN D. PEPE.
_____/

## REPORT AND RECOMMENDATION

**1. Background**

Plaintiff, Donald Tuck, brought this action under 42 U.S.C. §§ 405(g) and 1383(c) to challenge the Commissioner's final decision that he was not entitled to Supplemental Security Income ("SSI") under Title II of the Social Security Act. Plaintiff and Defendant filed motions for summary judgment (Dkts. # 8 & 14). Both motions have been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, **IT IS RECOMMENDED** that the Plaintiff's motion for summary judgment be **DENIED**, and that the Commissioner's motion for summary judgment be **GRANTED**.

**A. Procedural History**

Plaintiff, Donald Tuck, applied for SSI in February 2004, alleging disability since July 1970 due to an injured pelvis, back, and nerve damage (R. 36 & 44). Plaintiff's application was denied on April 22, 2004 (R. 13). Plaintiff filed a timely review and requested a hearing. Plaintiff appeared before administrative law judge ("ALJ") Regina Sobrino for a hearing on August 8, 2006 (R. 13). ALJ Sobrino issued her decision denying benefits on October 23, 2006 (R. 13-18). The Appeals Council denied review in May 2007 (R. 4-7).

1

B.  **Background Facts**

   1. *Plaintiff's Hearing Testimony and Statements*

Plaintiff was 44 years old at the time of the hearing (R. 163). He graduated from high school, and has not worked for about 30 years due to problems with his legs (R. 164). Plaintiff has troubling standing and walking. He estimates that he can stand for ten minutes or walk about 100 yards before stopping to rest. The furthest he walks regularly is 80 yards to and from his mailbox (R. 173). Rainy weather impedes walking and causes leg pain which is not relieved by medicine. Plaintiff does not use a cane (R. 164). Plaintiff estimates that he can sit for about an hour before needing to alter positions. He has trouble lifting objects and can lift 5 - 6 pounds from the floor (R. 165 & 179) and 10 pounds, from a table, using both hands (R. 179). He has difficulty picking up small objects such as pens or cards (R. 182). Given his difficulty writing, Plaintiff had a friend fill out his forms.

Plaintiff has trouble with his arms reaching up due to a neck injury (R. 166). He cannot bend at his waist, and if he bends at the knees to crouch he cannot stand up. Plaintiff is clumsy and does not possess good coordination (R. 174). A few years ago, he was told by his physician that he would be using a walker or wheelchair within six months to a year (R. 175). He owns a dog which he does not take for walks. Plaintiff lives by himself in a one-story home, and does some dishes, laundry and yard work. Plaintiff last climbed stairs a few years ago and cannot walk up 10 stairs. His friend comes over daily to help him dress and bathe (R. 167, 169). She also does his grocery shopping for him (R. 167).

He does not drive, and has not had a driver's license since it was taken away several years ago for driving under the influence of alcohol (R. 169). He drank heavily in the past, but

no longer drinks beer but daily has a couple glasses of wine (R. 172-73).

Plaintiff is a member of a Moose lodge, but he does not attend their meetings instead only goes to special events (R. 167-68). He regularly visits his mother and father who live three miles away. Plaintiff was driven by a friend to the hearing, and in the past several years has not taken a trip further than 75 miles (R. 170). Plaintiff fishes and deer hunts. When he fishes he does so from shore. When he hunts he is driven to his stand, uses a crossbow, and sits in a chair the entire time (R. 168).

Plaintiff takes medication some of which make him drowsy (R. 170). Dr. Zhao treats Plaintiff for his legs and neuropathy. Dr. Fuentes treated patient for his liver (R. 170-71).[1] Plaintiff was hospitalized overnight when his neck was broken on December 10, 2005, by a kick from a cow (R. 171).

### 2. *Medical Evidence*

On February 27, 2004, Weiguo Zhao, M.D., examined Plaintiff noting that he has a "history of numbness, tingling and pain in the legs" which had started a few months prior to his first visit to Dr. Zhao on July 15, 2002. At July 15, 2002, visit he was diagnosed with peripheral neuropathy of unknown etiology. Prior the to February 27 visit, his last visit with Dr. Zhao was July 30, 2002, which was an EMG nerve conduction study. Dr. Zhao noted that Plaintiff complains of worsening leg numbness which Neurotonin alleviates temporarily. Walking without assistive devices, Plaintiff complains of increasing weakness in his legs. Numbness and tingling in his hands is also worsening.

---

[1] The medical record does not list any information from Drs. Fuentes and Gavispi.

At the February 27 visit, Plaintiff denied that he suffered from urinary incontinence, shortness of breath or chest pain. Other than 300 mg Neurotonin daily, Plaintiff is taking no other medications. Plaintiff still drinks occasionally.

Dr. Zhao's February 27 exam found that Plaintiff's muscle strength in his upper and lower body measured 5/5. These scores were "significant" due to the presence of muscle wasting in the lower extremities and no spasticity. Sensory examination revealed a significant decrease in sensation for pinprick, temperature, and light touch in both legs. Decreased sensation was found in both arms about 15 centimeters bilaterally above the wrist. Plaintiff's gait was wide and slightly slow. Dr. Zhao increased the Neurotonin dosage to 400 mg three times a day.

On April 5, 2004, Dr. Zhao completed a Social Security evaluation and diagnosed Plaintiff as suffering from peripheral neuropathy.

State of Michigan Disability Determination Services called Dr. W. Zhao about Plaintiff on April 21, 2004 (R. 105). Dr. Zhao reiterated that Plaintiff suffers from neuropathy and muscle wasting on the front of his legs. Dr. Zhao thought that Plaintiff could walk distances, but was uncertain about either pace or distance. Plaintiff was not drug seeking and exhibited no indication that he was under the influence of alcohol. Plaintiff was cooperative with Dr. Zhao, exhibiting no indication of any mental illness.

On April 21, 2004, William Thomas, M.D., completed a Physical Residual Functional Capacity Assessment based on the record (R. 106 - 113). He found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and or walk for about 6 hours in an 8-hour workday, and was limited with regard to pushing and pulling with the lower extremities

4

(R. 107). It was determined that Plaintiff could occasionally balance, stoop, kneel, crouch and crawl (R. 108). He could occasionally climb ramp/stairs and never climb a ladder/rope/scaffold. Plaintiff was diagnosed as having no manipulative, visual or communicative limitations (R. 109 - 110). Plaintiff's environmental limitations were unlimited (R. 110). Dr. Thomas believed the Plaintiff's complaints were disproportionate to the nature of his impairments (R. 111). Handwritten notes by Dr. Thomas indicate that Plaintiff "has not sought treatment for alleged kidney and liver problems in almost 2 years. Anonymous report in file to SSA FO 356, states claimant is not disabled and spends all day at the bar and hunts and fishes. The claimant's statements regarding his allegations are felt to not be credible."

On June 23, 2004, Dr. Zhao examined Plaintiff who indicated that increased Neurotonin did significantly help, but his symptoms including leg pain, leg cramps and tingling in the upper extremities have increased (R. 127). Plaintiff also complained of balance and memory problems. Decreased sensation to pinprick was found in the legs and arms. Plaintiff had some muscle wasting in the feet, legs, and hands. Plaintiff's Neurotonin dosage was increased to 800 mg four times a day. Baclofen, 4 mg at bedtime, was prescribed as was 25 mg of Elavil increased to 50 mg after 7 days.

At Plaintiff's July 15, 2004, examination, Plaintiff's leg tingling and burning has significantly improved, but leg numbness remains. Leg cramps were also improved, and balance remained the same (R. 126). Dr. Zhao believed that the peripheral neuropathy is likely alcohol related, and balance problems can be related to alcohol and related neuropathy or cerebellum atrophy. A CT scan and blood tests were ordered.

When seen by Dr. Zhao on August 30, 2004, Plaintiff complained of increased balance

5

problems since his last visit on July 14, 2004 (R. 125). Plaintiff offered no new complaints noting that Neurotonin and Baclofen seem to help alleviate numbness in his legs. Recent lab results indicated that Plaintiff had decreased levels of B1, B6, and folic acid. Levels of B12 were normal, and levels of MCV, MCH and CBC were increased. Plaintiff's problems include peripheral and possible alcoholic neuropathy. His mother, who accompanied him to this examination, noted that he still uses alcohol. Plaintiff's gait problems remain, but a CT scan ruled out stroke as a cause. Dr. Zhao indicated that problems with gait are secondary to his neuropathy. Plaintiff was to continue with 800 mg of Neurotonin 4 times per day, Elavil 25 mg at bedtime and 10 mg Baclofen twice a day. Plaintiff was encouraged to gradually limit and then eliminate alcohol use.

An August 22, 2005, chest x-ray compared to one on November 16, 2003, revealed that lung volumes were increased, but Dr. Fallouh suspected that this was due to his "body habitus" and not a disorder (R. 122). Pulmonary vascularity as well as mediastinal, hilar and cardiac silhouettes were normal. There was no evidence of filtrates, effusions or of an active cardiopulmonary process.

On December 10, 2005, Plaintiff was admitted to Mid-Michigan Medical Center – Midland for injuries resulting from his being kicked in the head and chest by a cow (R. 136 & 152). Rami A. Dakkuri, M.D., examined Plaintiff noting the presence of a scalp laceration and hangman's fracture. Plaintiff denied any numbness or weakness in his arms. Plaintiff was also kicked in the chest by the cow, and reported right side chest pain. Plaintiff's past medical history indicated a pelvic fracture resulting in a colostomy. Upon examination, Plaintiff appeared comfortable with a regular heart rate. Fractures of the C2 and C3 vertebrae and right

6

ribs 5 and 6 were noted (R. 153). Plans were made for treating the neck fracture, and pain management the only treatment deemed necessary for the ribs.

A CT examination of Plaintiff's spine by Brian R. Copeland, M.D., on December 13, 2005, indicated that degenerative changes at the C5 and C6 vertebrae may represent old trauma (R. 151). There was no evidence of definite acute fractures.

On January 1, 2006, a CT scan performed by Mark W. Jones, M.D., revealed that moderately severe disk space narrowing at C5 and C6 (R. 137). Again, on this image, Dr. Jones did not see a definite fracture.

Plaintiff was examined by Dr. Jones on January 5, 2006 (R. 142 & 150). Plaintiff was in a Minerva brace, and unable to move his head. Plaintiff had no tingling in his arms or hands, but did have paraspinal pain on the left side.

A February 7, 2006, CT scan of Plaintiff's cervical spine revealed that the C2 and C3 vertebrae were fractured while the C1 and C4 vertebrae appeared intact (R. 134 & 148). Degenerative changes at the C5 and C6 vertebrae were also present.

On February 26, 2006, Mohanad Fallouh, M.D., conducted a bone density test which determined that Plaintiff suffers from osteoporosis (R. 119).

Plaintiff underwent a CT scan on March 20, 2006, that showed that C2 and C3 vertebrae were aligned and showed no sign of significant displacement (R. 132 & 146).

Dr. Jones' April 20, 2006, CT scan showed no change in alignment or position of the fractures at C2 and C3 (R. 130 & 144). Evidence of healing, particularly at the base of the C3 vertebrae was evident.

A June 13, 2006, CT scan found that fractures of C2 and C3 stable with bony healing

taking place along the laminal fractures (R. 129).

Upon examination by Dr. Jones on February 9, 2006, Plaintiff experienced aching behind the mastoids, but had no numbness or tingling. Plaintiff was still wearing Minerva brace, and his recovery was not sufficient to warrant replacement of the brace with a collar.

When Dr. Jones examined Plaintiff on March 23, 2006, Plaintiff noted an occasional clicking on the right side of his neck (R. 140). He had good strength in his grip, his finger and wrist extensors. Healing was insufficient to allow removal of his neck brace.

A May 4 follow-up examination by Dr. Jones indicated no significant neck pain and that the neck was heeling fine (R. 139). It was suggested that Plaintiff could be placed in a Philadelphia collar, and pending the outcome of another X-ray could be placed in a soft collar within six weeks.

A May 10, 2006, follow-up examination by Dr. Zhao showed that Plaintiff's peripheral neuropathy symptoms were worsening, yet his strength was about 5/5 in the lower and upper extremities (R. 124). Sensory examination indicated decreased pinprick sensation in his legs 30 to 40 centimeters above the knees and 10 centimeters above the wrists bilaterally. Use of Lyrica, a drug recently approved by the FDA, was discussed as was reducing Neurotonin usage to 800 mg three times a day. Plaintiff complained of nervousness and insomnia.

Dr. Zhao's June 7, 2006, notes indicate that Lyrica seems to help control Plaintiff's neuropathy, and did not cause any side effects (R. 123). Plaintiff took 800 mg of Neurotonin four times a day and then takes 75 mg Lyrica twice a day as part of a two day cycle. Plans to wean him from Neurotonin were discussed. Plaintiff also took Baclofen, Advil, thiamine and folic acid. Patient was awake and alert with blood pressure of 136/96. Pulse was 78.

8

A June 22, 2006, letter from Dr. Jones to Dr. Fallouh noted that Plaintiff "is doing well" experiencing no numbness or tingling in his arms and legs (R. 138). The fracture was healing, with a full range of neck motion and no pain. Plaintiff could end use of his neck brace.

When seen on July 18, 2006, Plaintiff was feeling a little bit better (R. 115). His lab results were "pretty normal" except his liver function tests. He was encouraged to limit his drinking, and asked to return in one month.

August 14, 2006, notes indicate that Plaintiff is eating better and drinking fluids (R. 115). He suffers from chronic tachycardia of 106-110, and possibly hepatitis C. His prescription was renewed.

Notes from September 15, 2006, indicate that Plaintiff's blood pressure had increased due to drinking more water. Plaintiff complained of right wrist pain. An X-ray was ordered.

Notes, apparently written by Dr. Sullivan in 2006, indicate that Plaintiff controls his pain with Percodan and Vicodin (R. 116). Plaintiff normally takes 4 Percodan per day, but has been using Vicodin when he was unable to renew the Percodan prescription. *Id*. Plaintiff claimed to take no other medications. He smoked one pack a day. These notes also indicate the cause of Plaintiff's pelvis injury: his leg was caught in a press causing hip and internal injuries. As a result, he has had a colostomy for 30 years. Suffering from chronic pain, Plaintiff does well on Percodan using 130 pills per month. Plaintiff drinks a fair amount of wine, but no water. He was asked to undergo labs and return in a week.

3. ***Vocational Evidence***

Vocational expert ("VE") Ann Tremblay was asked by ALJ Sobrino a hypothetical question involving a person who does not have past work experience, has a 12th grade

9

education, was born in 1952, and is limited to lifting, carrying, pushing and pulling 10 pounds frequently and 20 pounds occasionally (R. 182). Such a person could stand and walk from two to four hours in an eight hour work day, and sit for up to eight hours in an eight hour workday. This worker would be limited to simple and routine tasks. Additionally, the job should not involve the need to climb ladders, or to climb stairs, and stoop more than rarely, nor the need to kneel, crouch, crawl or walk on uneven terrain, use foot controls or be exposed to hazards and extreme temperatures.

VE Tremblay responded that such a person could perform light unskilled work as an assembler (9,000 in the lower peninsula of Michigan), inspector (4,700 positions) and stock clerk (3,100 positions)(R. 182). All these jobs involved a sit/stand option (R. 183). None of the jobs require exposure to vibration, but they all require a 40 hour work week. One day of absence per month would be acceptable in these positions. These jobs would require "less than frequent" handling, feeling or fingering (R. 184).

### 4. **ALJ Fina's Decision**

ALJ Sobrino found that Plaintiff has not engaged in substantial gainful activity since February 2004 (R. 15). Plaintiff has "severe" impairments of peripheral neuropathy, degenerative disc and joint disease in the neck, dysthymia, generalized anxiety and a history of alcohol abuse (R. 15), but none of these impairments alone or in combination equals any impairment listed in Appendix 1, Subpart P, Regulations No. 4. 20 C.F.R. § 404.

ALJ Sobrino determined that Plaintiff has the residual functional capacity ("RFC") for a limited range of unskilled light work with the ability to lift, carry, push and pull 10 pounds

10

frequently and twenty pounds occasionally. He is able to stand/walk 2-4 hours per 8-hour work day and sit up to 8 hours per 8-hour work day, provided he has the opportunity to alternate sitting and standing at will. He should not climb ladders, ramps or scaffolds. He can climb stairs or stoop rarely. He should not kneel, crouch or crawl, and is limited to frequent, not constant handling, fingering and felling. He should not reach overhead, be exposed to hazards or vibration, or operate foot controls. He should not have to walk on uneven terrain, or drive as a work duty. He should not be exposed to extremes of temperature, and is limited to performing simple, routine work (R. 16).

Plaintiff, age 45 years on the alleged disability onset date, was a younger individual under 20 C.F.R. 404.1563. Transferability of jobs skills is not material to the disability determination because Plaintiff does not have past relevant work. Considering Plaintiff's age, education, work experience and RFC, and referring to the jobs identified by the VE, ALJ Sobrino determined that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, and thus was not under a "disability" as defined in the Social Security Act, at any time through the date of decision (R. 17).

## II.  ANALYSIS

### A.  Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

**B.** **Factual Analysis**

Plaintiff asserts that ALJ Sobrino erred by too heavily weighting his recovery from a December 2005 neck injury that occurred after Plaintiff claims that he became disabled by peripheral neuropathy (Dkt. # 8 p. 5). Such error led the ALJ to determine "with no support"

---

[2] *See, e.g.*, *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinburger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

that Plaintiff could "lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally."
*Id*. at 7 (internal quotations omitted). Plaintiff alleges that the ALJ's determination misconstrued
Dr. Zhao's analysis particularly with regard to his upper body strength. *Id*. In so doing, the ALJ
misconstrued Dr. Zhao's analysis, and failed to give the opinions of Drs. Jones and Sullivan
controlling weight. *Id*. at 10. The ALJ, it is alleged, also failed to consider Plaintiff's daily
activities and the side effects of his medications. *Id*. at 7.

    **1.**    ***Proper Use of Treating Physicians' Opinions***

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability is binding on the Social Security Administration as a matter of law.[3] The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987).

In the present case, the ALJ was required to treat with special significance Plaintiff's medically determinable impairments (R. 15). Indeed, ALJ Sobrino adopted these impairments in making her determination (R. 15-18). Plaintiff argues that the ALJ was also required to give controlling weight to the statements of Drs. Jones and Sullivan that Plaintiff was "disabled" (R.

---

[3]*See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

115 & 152).⁴ Yet both of these references to disability appear to be statements regarding Plaintiff's medical history and not clear statements of their medical opinions. Neurosurgeon Jones, of the Mid-Michigan Medical Center, treated Plaintiff for his neck injury when Plaintiff was kicked in the head by a cow in December 2005. Dr. Jones's history indicated "the patient has a history of colostomy after a crush injury as a youth. He is disabled on the basis of that" (R. 154). Dr. Jones may have thought these past injuries had been disabling due to the neck injury he was treating. His neurological testing revealed good strength in Plaintiff's upper and lower extremities that day. Similarly, eight months after Dr. Jones's "disability" reference Dr. James Sullivan, also for the Mid-Michigan Medical Center, made a similar reference to Plaintiff's fractured pelvis years earlier as being disabling. He indicates treatment for chronic pain and hepatitis and was not giving a medical opinion on disability that would bind ALJ Sobrino. These notes, while referring to a prior injury suffered by Plaintiff three decades ago, do not indicate that Plaintiff required any medical care for his pelvis or that his pelvis was the cause of any disability. These notes likely reflect information provided them by Plaintiff, and are not the result of their medical analyses. Plaintiff also argues that the ALJ incorrectly analyzed the medical record created by Dr. Zhao.

ALJ Sobrino considered Dr. Zhao's diagnosis and treatment of Plaintiff. Plaintiff is

---

⁴Determination that an individual is disabled is for the discretion of the Commissioner. 20 C.F.R.§ 404.1527(e)(1); *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 800 (6th Cir. 2004)(A treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner.); *Wallace,* 367 F. Supp.2d at 1133. See 20 C.F.R. § 416.927(d) (providing that poorly supported opinions are entitled to little weight); *Bogle, v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993) ("[T]reating physician's opinions ... receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.").

correct that Dr. Zhao observed that Plaintiff suffered from muscle wasting in his feet, legs and hands as well a loss of sensation in his extremities (R. 124 - 28). Despite such problems, Dr. Zhao noted in May 2006 that Plaintiff continued to score 5/5 on strength tests for both the upper and lower extremities (R. 104 & 124). Dr. Zhao observed that Plaintiff had a slow, unsteady gait but is unsure as to how far and for what duration he could walk (R. 105 & 127). His April 21, 2004, contact reiterated there was no wasting in the upper extremities (R. 105). These findings are consistent with the State Medical Examiner's Physical Residual Functional Capacity Assessment which found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and or walk for about 6 hours in an 8-hour workday, and was limited with regard to pushing and pulling with the lower extremities (R. 107). It was determined that Plaintiff could occasionally balance, stoop, kneel, crouch and crawl (R. 108). With regard to climbing it was noted that he could occasionally climb ramp/stairs and never climb a ladder/rope/scaffold. Plaintiff was diagnosed as having no manipulative, visual or communicative limitations (R. 109 - 110). Plaintiff's environmental limitations were unlimited (R. 110).

 Nothing in Dr. Zhao's report specifically rejects the findings of this Assessment or the ALJ's more restrictive finding that Plaintiff possessed the residual functional capacity to lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally. He is able to stand/walk 2-4 hours per 8-hour work day and sit up to 8 hours per 8-hour work day, provided he has the opportunity to alternate sitting and standing at will. He should not climb ladders, ramps or scaffolds. He can climb stairs or stoop rarely. He should not kneel, crouch or crawl, and is limited to only frequently handling, fingering and felling. He should not reach overhead, be exposed to hazards or vibration, or operate foot controls. He not have to walk on uneven terrain,

or drive as a work duty. He should not be exposed to extremes of temperature, and is limited to performing simple, routine work (R. 16).

ALJ Sobrino was permitted to give greater weight to Dr. Zhao's analysis than to unsupported medical history references by Drs. Sullivan or Jones indicating that Plaintiff was disabled, particularly as it was consistent with the findings of Dr. Thomas, the state agency's consulting physician. The ALJ appropriately gave Dr. Zhao's analysis greater weight due to the fact that Dr. Zhao had examined Plaintiff for the longest period of time. For one alleging disability, Plaintiff's medical record is sparse. The paucity of a record is more apparent given that the majority of the medical record addresses Plaintiff's neck injury and not the source of his disability – peripheral neuropathy. Drs. Sullivan and Jones only treated Plaintiff for a few months from December 2005 to mid-2006 (R. 115 - 16). The vast majority of Plaintiff's neuropathy treatment was conducted by Dr. Zhao from 2002 until 2006. His analysis is thorough, detailed and exhibits that Plaintiff's condition was relatively stable (R. 123 - 28). By way of comparison, Drs. Sullivan and Jones made only cursory observations about Plaintiff and they fail to address his gait, loss of feeling in the extremities, balance or prescriptions for Neurotonin, Elavil or Baclofen. These references to Plaintiff's disability due to his earlier injury which they did not treat warrant little weight.

The ALJ in evaluating the severity of Plaintiff's limitations considered that Plaintiff's daily activities including some housework, shopping at Wal Mart with his mother,[5] attendance at Moose lodge meetings, fishing and hunting, reading, playing with puzzles, and visiting family.

---

[5] While not disagreeing with the larger analysis, it is a stretch to suggest that Plaintiff shops at Wal Mart given his statement that others shop for him and that he went once to Wal Mart as his mother stopped prior to taking Plaintiff to a medical appointment.

16

Looking at these activities, the ALJ concluded that Plaintiff has moderately impaired functioning in the area of concentration, persistence and pace. As a result, ALJ Sobrino took Plaintiff's present restrictions into account when determining that there exists a limited range of work which Plaintiff could perform (R. 16).

The ALJ's reliance on the medical record provided by Dr. Zhao and Thomas and her discounting unsupported references to disability by other doctors is reasonable her legitimate exercise of discretion. *See* C.F.R. § 416.927(d) (stating how medical evidence is weighed using factors such as length of treatment relationship and nature and extent of treatment.). The final responsibility for deciding medical issues is the ALJ's. Accordingly, there is substantial evidence to uphold ALJ Sobrino's proper weighting and use of the physician's opinions offered about Plaintiff's condition.

### III. RECOMMENDATION

For the reasons stated above, it is recommended that Defendant's Motion for Summary Judgment be **GRANTED** and Plaintiff's motion be **DENIED**. Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


DATED: July 24, 2008           s/ Steven D. Pepe  
Ann Arbor, MI           STEVEN D. PEPE  
          United States Magistrate Judge


**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing ***Report and Recommendation*** was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 24, 2008.


          s/ Alissa Greer  
          Case Manager to Magistrate  
          Judge Steven D. Pepe  
          (734) 741-2298