UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DONALD F. TUCK,

        Plaintiff,

v.

        Case Number 07-12853-BC
        Honorable Thomas L. Ludington

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____ /

**ORDER ADOPTING REPORT AND RECOMMENDATION, OVERRULING PLAINTIFF'S OBJECTIONS, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

In February, 2004, Plaintiff Donald Tuck ("Plaintiff") filed an application with Defendant Commissioner of Social Security ("Defendant" or "Commissioner") for supplemental security income. Plaintiff alleged he is disabled due to several impairments, including a crushed pelvis, shorter left leg, hepatitis C, and kidney and liver problems. On April 22, 2004, Defendant denied Plaintiff's application and Plaintiff sought de novo review by an administrative law judge ("ALJ").

The ALJ held a hearing on August 8, 2006, and issued a decision on October 23, 2006. The ALJ concluded that Plaintiff was not disabled for two reasons. First, Plaintiff's combination of impairments did not meet or equal one of the listed impairments. Second, the ALJ found Plaintiff was not disabled because there were substantial jobs existing in the national economy that Plaintiff could perform based on his residual functional capacity ("RFC"). On December 27, 2006, Plaintiff sought review with the Appeals Council. On May 3, 2007, the Appeals Council denied Plaintiff's request for review.

On July 9, 2007, Plaintiff sought review of the ALJ's decision before this Court. The case was referred to Magistrate Judge Steven D. Pepe for determination of the non-dispositive issues, and

for a report and recommendation. On October 22, 2007, Plaintiff filed a motion for summary judgment, and on January 15, 2008, Defendant filed a motion for summary judgment. On July 24, 2008, the magistrate judge issued a report and recommendation, recommending that the Court affirm the ALJ's decision, grant Defendant's motion for summary judgment, and deny Plaintiff's motion for summary judgment. The magistrate judge concluded that the ALJ's finding that Plaintiff had the RFC to perform a limited range of light work and that there are substantial jobs existing in the national economy that Plaintiff can perform, was based on substantial evidence.

On August 7, 2008, Plaintiff objected to the report and recommendation on six different grounds, contending that the Court should not grant summary judgment in favor of Defendant. Defendant did not file a response to Plaintiff's objections. For the reasons stated below, the Court will **ADOPT** the report and recommendation, **GRANT** Defendant's motion for summary judgment, and **DENY** Plaintiff's motion for summary judgment.

I

Plaintiff was born on March 11, 1952. At the time of the administrative hearing before the ALJ, Plaintiff was fifty-four years old. After graduating from high school, Plaintiff began work in a factory. In July, 1970, he suffered a pelvic crush injury at his workplace. Subsequent to his injury, Plaintiff attempted to work for two days, but he was unable to work due to pain. Plaintiff has not worked since then, and continues to receive worker's compensation. Plaintiff broke his neck on December 10, 2005, when he was kicked by a cow.

Plaintiff testified that he has problems walking and standing. Plaintiff estimates that he can only walk about one-hundred yards before he needs to rest; Plaintiff walks no more than eighty yards, the distance to his mailbox, on a regular basis. Plaintiff testified that rainy weather impedes

his ability to walk even further because he experiences pain in his legs, which medicine does not relieve. Plaintiff does not use a cane or other walking aid, although several years ago a physician told him he would need a walker or a wheelchair within six months to a year. Plaintiff testified that he has not climbed stairs in a few years, and that he cannot walk up ten stairs. Plaintiff estimates that he can only stand for ten minutes without needing to rest. Plaintiff also estimates that he can only sit for an hour before he needs to alter his position.

Plaintiff testified that he has trouble lifting objects; Plaintiff can lift five to six pounds from the floor, and ten pounds from a table, using both hands. Plaintiff has difficulty picking up small objects, such as pens or cards. Plaintiff testified that he cannot bend at his waist, and if he bends at the knees to crouch, he cannot stand up. Plaintiff is clumsy and does not possess good coordination. Plaintiff testified that he has trouble reaching up with his arms.

Plaintiff testified that he lives by himself in a one-story home, and occasionally washes dishes, cleans laundry, and does yard work. Plaintiff owns a dog, which he does not take for walks. A friend of Plaintiff's comes to his house daily to help him bathe and dress, and also goes grocery shopping for him. Plaintiff does not drive; several years ago, his driver's license was revoked for driving under the influence of alcohol. Plaintiff testified that he drank alcohol heavily in the past, but that he no longer drinks beer. He testified that he only drinks a couple of glasses of wine daily. A friend of Plaintiff's drove him to the administrative hearing. In the past several years, Plaintiff has not traveled more than 75 miles.

Plaintiff testified that he is a member of a Moose lodge, but that he only attends their special events every few months. Plaintiff likes to fish, which he does from the shore. Plaintiff also likes

to hunt with a cross-bow, which he does from a sitting position in a chair at his stand. Plaintiff regularly visits his parents, who live three miles away.

Plaintiff first visited Dr. Zhao on July 15, 2002. (Tr. 104.) At that time, Plaintiff indicated he had a "history of numbness, tingling and pain in the legs [for] about a few months." (*Id.*) Dr. Zhao diagnosed Plaintiff with "severe peripheral neuropathy of unknown etiology." (*Id.*) Plaintiff returned to Dr. Zhao on July 30, 2002, and Dr. Zhao performed a nerve conduction study. (*Id.*) Plaintiff began taking Neurontin to control his symptoms. (*Id.*)

On February 27, 2004, Plaintiff returned to Dr. Zhao, stating that "his symptoms of leg numbness and tingling are getting much worse." (*Id.*) Plaintiff indicated the Neurontin (400 mg, three times a day) only alleviated his symptoms for a few hours, and Plaintiff complained of "increased weakness in the legs." (*Id.*) Plaintiff complained that "numbness and tingling [of] the hands are getting worse." (*Id.*) Plaintiff denied having urinary incontinence, shortness of breath, chest pain, loss of consciousness and seizure activity. (*Id.*) Plaintiff indicated he drank alcohol occasionally. (*Id.*)

Plaintiff's physical exam revealed that "[s]ensation was normal" and that "[m]uscle strength was 5/5 in the upper extremities and was slightly weaker than the lower extremities but was still 5/5." (*Id.*) Dr. Zhao noted that this was "significant for muscle wasting of the lower extremities and primarily no spasticity." (*Id.*) Dr. Zhao also noted a "significant decrease in sensation for pinprick, temperature, light touch, in both legs," and "decreased sensation for pinprick and temperature in both hands." (*Id.*) Plaintiff's gait was "slightly slow" and "wide based." (*Id.*) Dr. Zhao indicated that Plaintiff's peripheral neuropathy was still of unknown etiology, and increased Plaintiff's Neurontin dosages to "400 mg in the am, noon, and pm and 800 mg at bedtime." (*Id.*)

On April 5, 2004, Dr. Zhao confirmed Plaintiff's diagnosis of peripheral neuropathy on a social security evaluation form. (Tr. 100-03.) On April 21, 2004, Dr. Zhao again confirmed Plaintiff's diagnosis of neuropathy and muscle wasting in response to a phone call from the State of Michigan Disability Determination Services. (Tr. 105.) Dr. Zhao indicated he was not sure how far or how fast Plaintiff could walk. (*Id.*)

On April 21, 2004, Dr. William Thomas completed a physical residual functional capacity assessment based on the record. (Tr. 106-14.) Dr. Thomas found that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and walk for about six hours in an eight-hour work day, and that Plaintiff was limited in his ability to push and pull with the lower extremities. (Tr. 107.) Dr. Thomas determined that Plaintiff could occasionally balance, stoop, kneel, crouch and crawl, and that Plaintiff could occasionally climb a ramp or stairs, and never climb a latter, rope or scaffold. (Tr. 108-10.) Dr. Thomas determined that Plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 109-10.) Dr. Thomas indicated his belief that Plaintiff's complaints were disproportionate to the nature of his impairments. (Tr. 111.) Dr. Thomas's handwritten notes provide:

> [Plaintiff] has not sought treatment for alleged kidney and liver problems in almost two years. Anonymous report in file . . . states claimant is not disabled and spends all day at the bar and hunts and fishes. The claimant's statements regarding his allegations are felt to be not credible.

(*Id.*) The report referred to by Dr. Thomas is a note from an anonymous phone call to Defendant, dated April, 2, 2004. The note provides:

> Caller found paperwork sent to DI re disability and daily activities - caller will remain unanonymous (sic.) -
>
> Caller states [Plaintiff] isn't disabled - he sits in bar from morning to night - he hunts and fishes.

On paperwork he says he needs assistance, both personal and financial but he doesn't -

The person who helped him complete the paperwork . . . is a crackhead with two kids she doesn't take care of.

Caller feels [Plaintiff] is abusing system and wants this info in file - he could work if he chose to do so. When I asked how [Plaintiff] was living, caller said his parents support him.

(Tr. 79-80.)

On June 23, 2004, during his visit with Dr. Zhao, Plaintiff told the doctor that the increased dosage of Neurontin he had prescribed for Plaintiff in February, 2004, significantly decreased the pain Plaintiff felt. (Tr. 127.) However, Plaintiff indicated his symptoms were worsening, including "pain in the legs and also leg cramps . . . tingling in the arms, hands and fingers . . . balance problems and a tendency to fall." (*Id.*) Dr. Zhao noted Plaintiff has muscle wasting in his feet, hands, and legs, decreased sensation to pinprick and temperature in his hands, and decreased sensation to pinprick and light touch in his legs. (*Id.*) Dr. Zhao increased Plaintiff's Neurontin dosage to 800 mg four times a day. (*Id.*) He also prescribed Plaintiff 4mg of Baclofen and 50 mg of Elavil (25 mg for the first seven days) at bedtime. (*Id.*)

On July 15, 2004, during his visit with Dr. Zhao, Plaintiff told the doctor his leg tingling and burning had significantly improved, but that his leg numbness remained. (Tr. 126.) Plaintiff indicated he was experiencing fewer leg cramps, but that his balance had not improved. (*Id.*) Dr. Zhao indicated alcohol is likely causing the peripheral neuropathy. (*Id.*) He also indicated Plaintiff's balance problems could be a result of the neuropathy, or cerebellum atrophy. (*Id.*) Dr. Zhao administered a CT scan to check for cerebellum atrophy. (*Id.*)

On August 30, 2004, Plaintiff told Dr. Zhao that he was experiencing increased muscle spasms in his legs, numbness of his arms and legs, and balance problems. (Tr. 125.) Plaintiff indicated that Neurontin and Baclofen seem to help alleviate his symptoms. (*Id.*) Dr. Zhao repeated

his observations concerning Plaintiff's muscle wasting, decreased sensation in his hands and legs, and alcohol use. (*Id.*) Dr. Zhao decreased Plaintiff's dosage of Elavil from 50 mg to 25 mg, because Plaintiff had made several complaints of drowsiness. (*Id.*)

On December 10, 2005, Plaintiff was admitted to Mid-Michigan Medical Center – Midland; Plaintiff was injured when he was kicked in the head and chest by a cow. (Tr. 136, 152.) Dr. Rami A. Dakkuri examined Plaintiff and noted a scalp laceration and a hangman's fracture. Plaintiff denied any numbness or weakness in his arms, but reported chest pain on his right side. Dr. Dakkuri noted that Plaintiff's medical history included a pelvic fracture resulting in a colostomy. Dr. Dakkuri also noted Plaintiff had fractured his C2 and C3 vertebrae and two of his right ribs. (Tr. 153.) On December 13, 2005, Dr. Brian R. Copeland administered a CT scan of Plaintiff's spine and indicated that degenerative changes at Plaintiff's C5 and C6 vertebrae may represent old trauma. (Tr. 151.)

On January 1, 2006, Dr. Mark W. Jones administered a CT scan of Plaintiff's spine, which revealed moderately to severe disk space narrowing at C5 and C6. (Tr. 137.) Dr. Jones did not see a definite fracture. Dr. Jones examined Plaintiff on January 5, 2006. (Tr. 142, 150.) He indicated that Plaintiff wore a Minerva brace, and that Plaintiff was unable to move his head. Plaintiff indicated he did not have tingling in his arms or hands, but that he did have paraspinal pain on his left side.

On February 7, 2006, Dr. Jones indicated that a CT scan of Plaintiff's cervical spine revealed that the C2 and C3 vertebrae were fractured while the C1 and C4 vertebrae appeared intact. (Tr. 134, 148.) Dr. Jones also noted degenerative changes at the C5 and C6 vertebrae. On February 9, 2006, Plaintiff told Dr. Jones he was experiencing aching behind the mastoids, but that he did not

have any numbness or tingling. Dr. Jones indicated that Plaintiff was still wearing a Minerva brace, and that Plaintiff's recovery was not sufficient to warrant replacement of the brace with a collar. On February 26, 2006, Dr. Mohanad Fallouh conducted a bone density test, which indicated that Plaintiff was suffering from osteoporosis. (Tr. 119.)

On March 20, 2006, Dr. Jones administered another CT scan, which showed that Plaintiff's C2 and C3 vertebrae were aligned and that Plaintiff did not have significant displacement. (Tr. 132, 146.) When Dr. Jones examined Plaintiff on March 23, 2006, Plaintiff noted an occasional clicking on the right side of his neck. (Tr. 140.) Dr. Jones noted that Plaintiff had good grip strength in his finger and wrist extensors. Dr. Jones indicated that Plaintiff's healing was insufficient to allow removal of his neck brace.

Another CT scan on April 20, 2006, showed no change in alignment or position of the fractures at C2 and C3. (Tr. 130, 144). A June 13, 2006, CT scan showed that fractures of C2 and C3 were stable, with bony healing taking place along the laminal fractures. (Tr. 129.) On May 4, 2006, a follow-up examination by Dr. Jones indicated that Plaintiff did not have significant neck pain and that Plaintiff's neck was heeling fine. (Tr. 139.) Dr. Jones suggested that Plaintiff could be placed in a Philadelphia collar, and that he could likely be placed in a soft collar within six weeks.

A May 10, 2006, follow-up examination by Dr. Zhao showed that Plaintiff's peripheral neuropathy symptoms were worsening, yet his strength was about 5/5 in the lower and upper extremities. (Tr. 124.) Dr. Zhao documented that Plaintiff continued to have decreased pinprick sensation in his legs 30 to 40 centimeters above the knees and 10 centimeters above the wrists bilaterally. Dr. Zhao discussed the possibility of prescribing Lyrica with Plaintiff, and reducing

Plaintiff's Neurontin usage to 800 mg three times a day. Plaintiff complained of nervousness and insomnia.

Dr. Zhao's June 7, 2006, notes indicate that Lyrica seemed to help control Plaintiff's neuropathy, and did not cause any side effects. (Tr. 123.) At that point, Plaintiff was taking 800 mg of Neurontin four times a day, and 75 mg of Lyrica twice a day. Dr. Zhao discussed with Plaintiff the possibility of weaning him from Neurontin.

A June 22, 2006, letter from Dr. Jones to Dr. Fallouh noted that Plaintiff "is doing well," and not experiencing any numbness or tingling in his arms and legs. (Tr. 138.) Plaintiff's fracture was healing, and he was developing a full range of neck motion with no pain. Dr. Jones indicated that Plaintiff no longer needed a neck brace. On July 18, 2006, Plaintiff indicated that he was feeling a little bit better. (Tr. 115.) His lab results were "pretty normal" except his liver function tests. He was encouraged to limit his drinking, and asked to return in one month.

August 14, 2006, notes, apparently written by Dr. Sullivan, indicate that Plaintiff is eating better and drinking fluids. (Tr. 115.) Dr. Sullivan noted that Plaintiff suffers from chronic tachycardia of 106-110, and possibly hepatitis C. Dr. Sullivan's notes from September 15, 2006, indicate that Plaintiff's blood pressure had increased due to drinking more water, and that Plaintiff complained of right wrist pain. Dr. Sullivan's 2006 notes also indicate that Plaintiff has "good pain control" with Percodan and Vicodin. (Tr. 116.) Plaintiff claimed to take no other medications at that time. These notes also indicate the cause of Plaintiff's pelvis injury: his leg was caught in a press causing hip and internal injuries. As a result, he has had a colostomy for 30 years.

II

The Commissioner of Social Security determines whether a claimant is disabled in accordance with a five step process. The claimant must demonstrate the four following criteria: (1) the claimant is not engaged in substantial gainful employment; (2) the claimant suffers from a severe impairment; (3) the impairment meets a "listed impairment;" and (4) the claimant does not retain the residual functional capacity to perform her relevant past work. 20 C.F.R. § 416.920(a)(4)(i)-(iv). At the fifth and final step, the Commissioner determines whether the claimant is able to perform any other gainful employment in light of the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 416.920(a)(4)(v).

In the decision dated October 23, 2006, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listed impairments, 20 C.F.R. § 416.920(a)(4)(iii), and that due to his RFC, Plaintiff was able to perform a significant number of jobs existing in the national and regional economy. 20 C.F.R. § 416.920(a)(4)(v). The ALJ found that Plaintiff suffered from several severe impairments, including peripheral neuropathy, degenerative disc disease and degenerative joint disease in the neck, and dysthymia, generalized anxiety, and alcohol abuse. The ALJ summarized Dr. Zhao's medical reports regarding Plaintiff's neuropathy, and Dr. Jones's medical reports regarding Plaintiff's degenerative disc disease and degenerative joint disease. The ALJ relied on a vocational expert to determine whether Plaintiff had the RFC necessary to perform a significant number of jobs available in the national and regional economy. The ALJ provided the following hypothetical to the vocational expert to describe a person with Plaintiff's RFC:

> . . . . I want you to assume someone who does not have a past work as that term is defined in the Social Security regulations. I want you to assume a person who has a twelfth grade education, who was born in 1952. I want you to assume someone who is limited to lifting, carrying, pushing and pulling ten pounds frequently and twenty pounds occasionally.

> Assume a person who can stand and walk from two to four hours in an eight hour work day and sit for up to eight hours in an eight hour work day. The person should not have to climb ladders or scaffolds, can rarely climb stairs, and rarely stoop. By rarely, I mean not never but less than occasional. The person should not have to kneel, crouch, or crawl, should not have to walk on uneven terrain to do the work. Assume a person who should not be exposed to hazards, should not have to operate foot or leg controls. The person should not need to drive as a work duty and should not be exposed to extremes of temperature. Assume a person limited to work with simple and routine.

(Tr. 182.) The vocational expert indicated that are a significant number of jobs available in the regional or national economy that a person with those limitations could perform in the "light unskilled category." (*Id.*) Jobs in this category include work as an assembler, inspector, and stock clerk. (*Id.*) These jobs require lifting between ten and twenty pounds occasionally, but do not require more than frequent handling, fingering, or feeling. (Tr. 183-84.)

The ALJ indicated that the description of Plaintiff's RFC that he provided to the vocational expert was "generally consistent with the conclusion of [Dr. Thomas,] who reviewed the record in April 2004." (Tr. 16.) The ALJ indicated that he considered all of Plaintiff's symptoms, to the extent they "can reasonably be accepted as consistent with the objective medical evidence and other evidence." (*Id.*) The ALJ acknowledged Plaintiff's testimony concerning pain in his legs, back, and neck, but indicated that Plaintiff "remains active and has adequate pain control." (*Id.*) The ALJ also acknowledged that Plaintiff has muscle wasting in his lower extremities, but that his upper extremity strength is normal. (*Id.*) The ALJ acknowledged that Plaintiff has a history of peripheral neuropathy, but found that Plaintiff's allegation that he cannot lift more than six pounds was inconsistent with clinical findings and Plaintiff's treatment history. (*Id.*) Ultimately, the ALJ concluded that Plaintiff's statements concerning the "intensity, persistence and limiting effects" of his symptoms "are not fully consistent with the weight of record evidence." (*Id.*)

The Court reviews Defendant's decision to determine whether its "factual findings . . . are supported by substantial evidence." *Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028 (6th Cir. 1990) (citing 28 U.S.C. § 405(g)). Substantial evidence "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Even if the evidence could also support another conclusion, the decision of the ALJ must stand if the evidence could reasonably support the conclusion reached. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). A district court does not resolve conflicts of evidence or issues of credibility. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

III

Plaintiff objects that the magistrate judge ignored inconsistencies between the medical evidence and the ALJ's conclusion that Plaintiff's pelvic crush injury, which occurred over thirty years ago, did not render Plaintiff disabled. Plaintiff also objects that the ALJ erred by not giving controlling weight to the medical opinions of Drs. Jones and Sullivan, and that the magistrate judge's characterization of these opinions as statements regarding Plaintiff's medical history, rather than opinions, is inaccurate. The magistrate judge recognized that an examining physician's opinion is entitled to more weight than a non-examining source, and a treating physician's opinion is entitled to more weight than a consultative physician who only examined the claimant one time. 20 C.F.R. § 404.1527(d)(1)-(2); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). However, an ALJ is not required to give controlling weight to the opinion of a treating physician when it is "inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

As the magistrate judge pointed out, neither Dr. Jones nor Dr. Sullivan treated Plaintiff for his pelvic crush injury; thus, their opinions regarding this injury are not entitled to the deference that the opinions of treating physicians are afforded. In addition, their "opinions" related to Plaintiff's pelvic crush injury are accurately characterized as conclusory statements, not explained by medical findings, that Plaintiff was disabled due to the pelvic crush injury. *See* 20 C.F.R. § 416.927(d) (providing that poorly supported opinions are entitled to little weight); *Workman v. Comm'r of Soc. Sec.*, 105 F.App'x 794, 800 (6th Cir. 2004) (finding that "[a] treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner"). The ALJ considered the other physicians' opinions, including Dr. Zhao's, related to the pain Plaintiff alleged he suffered, and the daily activities in which Plaintiff testified he engaged. Based on this evidence, the ALJ determined that Plaintiff's pain was adequately controlled. While the medical evidence may not establish that Plaintiff is able to perfectly control his pain through the use of medication, substantial evidence supports the ALJ's determination that Plaintiff can adequately control his pain, and is not disabled on that basis. The record does not contain any other medical evidence related to Plaintiff's pelvic crush injury.

Plaintiff objects that the ALJ and the magistrate judge failed to take into account Plaintiff's limitations caused by peripheral neuropathy, particularly when determining Plaintiff's RFC. Plaintiff also objects that the ALJ's findings as to the activities Plaintiff is able to engage in are not supported by the activities in which Plaintiff actually engages. The ALJ specifically stated in his decision that he considered all of Plaintiff's symptoms, to the extent they "can reasonably be accepted as consistent with the objective medical evidence and other evidence." The ALJ is not

required to find that all of Plaintiff's claims are credible; rather, the ALJ considers Plaintiff's claims regarding his physical limitations, and his claims regarding his ability to engage in particular activities, in light of the medical evidence. Thus, although Plaintiff claimed that he could lift no more than six pounds, the ALJ relied on Dr. Thomas's opinion that Plaintiff could lift ten to twenty pounds. Plaintiff did not provide any other evidence to indicate that his ability to lift weight was as limited as he claimed. Dr. Zhao did not provide any evidence as to Plaintiff's ability to lift objects weighing more than six pounds, nor did any other doctor besides Dr. Thomas.[1]

Moreover, in determining the severity of Plaintiff's limitations, the ALJ properly relied on the activities that Plaintiff indicated he engaged in, including some housework, attending Moose lodge special events, fishing and hunting while sitting, reading, putting together jigsaw puzzles, and visiting with his family. Thus, because there is no evidence to contradict Dr. Thomas's opinion that Plaintiff can lift ten to twenty pounds, and Plaintiff's daily activities are consistent with the ALJ's conclusion, the Court agrees with the magistrate judge that the ALJ's finding of Plaintiff's RFC was supported by substantial evidence.

Plaintiff objects that the ALJ's reliance on the vocational expert's testimony at the administrative hearing was improper because the vocational expert's testimony was vague and evasive as to the frequency of the use of hands in the jobs Plaintiff could allegedly perform. This objections is meritless. The alleged deficiencies in the vocational expert's testimony do not lead to

---

[1] The ALJ's reliance on Dr. Thomas's evaluation of Plaintiff may raise due process concerns, as Dr. Thomas referred to the record of the anonymous phone call in Plaintiff's file at the same time that he questioned Plaintiff's credibility. *See McClees v. Sec'y of Health & Human Servs.*, 879 F.2d 451, 453-54 (8th Cir. 1989) (discussing *Richardson v. Perales*, 402 U.S. 389, 401-06 (1971)); *Green v. Sec'y of Health & Human Servs.*, 17 F.3d 1436 (table), 1994 WL 60384 (10th Cir. 1994); *Moran v. Comm'r of Soc. Sec.*, 4:07-CV-073, 2008 WL 2705091 (D.N.D. July 8, 2008); *Derrig v. Comm'r of Soc. Sec.*, 905 F.Supp. 584, 601-02 (N.D. Iowa 1995). However, Plaintiff did not raise the issue in his motion for summary judgment or in his objections to the report and recommendation. Accordingly, the Court will not address the issue.

the conclusion that the ALJ's determination that Plaintiff can perform a substantial number of jobs existing in the regional and national economies is not supported by substantial evidence.

Likewise, Plaintiff's objection that the ALJ and magistrate judge misconstrued Dr. Zhao's medical reports concerning muscle wasting in his extremities is without merit. As the magistrate judge pointed out, the ALJ acknowledged Dr. Zhao's reports of muscle wasting, but also relied on Dr. Zhao's indications that despite the wasting, Plaintiff had normal strength.

IV

The Court has reviewed the record evidence and the ALJ's opinion, and agrees with the magistrate judge that, under the governing standards, the ALJ's decision was within the range of discretion allowed by law and is supported by substantial evidence.

Accordingly, it is **ORDERED** that the report and recommendation [Dkt. # 16] is **ADOPTED**, and that Plaintiff's objections to the report and recommendation [Dkt. # 17] are **OVERRULED**.

It is further **ORDERED** that Defendant's motion for summary judgment [Dkt. # 14] is **GRANTED**, and that Plaintiff's motion for summary judgment [Dkt. # 8] is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: September 26, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 26, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS